# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MELANIE A. SHAW,          )
          )
     Plaintiff,        )
          )
     vs.          )     **Case number 4:12cv0451 JCH**
          )                 **TCM**
CAROLYN W. COLVIN, Acting  )
Commissioner of Social Security,[1] )
          )
     Defendant.      )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Melanie A. Shaw for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433. Ms. Shaw has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

### Procedural History

Melanie Shaw (Plaintiff) applied for DIB in August 2009, alleging she was disabled as of the beginning of that month[2] by arthritis, bulging discs, sciatica, and degenerative disc

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is hereby substituted for Michael J. Astrue as defendant. See 42 U.S.C. § 405(g).

[2]The alleged onset date of disability was amended at the first hearing to be February 1, 2008.

disease.  (R.[3] at 166-69, 192.)  Following two hearings, the Administrative Law Judge (ALJ),

James B. Griffith, determined that Plaintiff had several severe impairments which rendered

her disabled up through April 20, 2010, and that she thereafter improved and was no longer

disabled.  (Id. at 9-29, 38-85.)  The Appeals Council denied Plaintiff's request for review,

effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-

3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Gary Weimholt, M.S., C.D.M.S.,[4] testified at

the first, December 2010 hearing.

Plaintiff, thirty-five years old at the time of the hearing, testified that she is 5 feet 5

inches tall and weighs 220 pounds.  (Id. at 57.)  She graduated from high school and is able

to read, write, and do arithmetic.  (Id.)  She lives with her husband and three children, ages

thirteen, eleven, and five.  (Id. at 66-67.)

She last worked in February 2008, see note 2, supra, as a cashier for Save-A-Lot.  (Id.

at 57-58.)  She was dismissed from that job because she could no longer perform it after

injuring her back in June 2007.  (Id. at 58.)  After various treatments, e.g., muscle relaxers,

physical therapy, and injections, failed to give her pain relief, she underwent back surgery

in September 2009.  (Id. at 58-59.)  Following the surgery, she was prescribed pain

medication.  (Id. at 60.)  She was also referred to a pain management specialist, but could not

---

[3]References to "R." are to the administrative record filed by the Commissioner with her
answer.

[4]Certificate of Disability Management Specialist.

pursue it because she had lost her insurance. (Id.) Plaintiff described her pain as worse after the surgery. (Id.) Specifically, it is more intense, more frequent, and more limiting. (Id.) Her doctor also prescribed sertraline[5] and gabapentin.[6] (Id. at 61.) These medications are for pain management and anxiety. (Id.) She takes the pain medication three times a day and the anxiety medication once a day. (Id. at 70.) She has been treated sporadically for anxiety since 1999. (Id. at 61.) She is "very anxious all the time, irritable, mood changes . . . ." (Id.) She has had her present level of anxiety since she stopped working. (Id. at 72.) She also takes ibuprofen approximately three times a day and, occasionally, Zantac (for heartburn relief). (Id. at 71.)

Before working for Save-A-Lot, Plaintiff worked for the Respiratory Group as a quality inspector, tester, and, occasionally, repair person. (Id.) She left this job when she became pregnant. (Id. at 62.) She cannot now return to that job because she can no longer sit for eight hours or do the type of work required. (Id.)

Her job before the Respiratory Group was at Control Devices. (Id.) This required basically the same type of work as did the Respiratory Group. (Id.) She left that job when her child was born. (Id.) She cannot now return to that job because she cannot sit or stand for eight hours a day. (Id. at 63.)

---

[5]Sertraline is prescribed for the treatment of panic attacks and depression. See Zoloft (sertraline HCI), http://www.medilexicon.com/drugs/zoloft_292.php (last visited May 8, 2013).

[6]Gabapentin is an anticonvulsant used to control certain types of seizures, relieve restless leg syndrome, and relieve neuropathic pain. See Nat'l Inst. of Health, Gabapentin, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited May 8, 2013).

Plaintiff further testified that she cannot sit for longer than five minutes without being in pain, cannot lift or carry anything heavier than a gallon of milk, and cannot stand for longer than twenty minutes.  (<u>Id.</u> at 64-65.)  She does not drive, and never has.  (<u>Id.</u> at 65.)

Plaintiff described her pain as originating in her low back and radiating to her left leg.  (<u>Id.</u> at 66.)  Sometimes, it also radiates to her right leg.  (<u>Id.</u>)  The pain is a constant aching and, occasionally, sharp feeling.  (<u>Id.</u>)  It occurs a minimum of once a day and is never entirely absent.  (<u>Id.</u>)  Because of her pain, Plaintiff only gets four to five hours of sleep a night.  (<u>Id.</u> at 67.)  Consequently, she is tired during the day and has difficulty focusing.  (<u>Id.</u>)  The household members share the cooking and housework duties.  (<u>Id.</u> at 67-68.)  For instance, her children help her with getting pots and pans out of the cabinet.  (<u>Id.</u> at 68.)  She does some vacuuming and washing of dishes.  (<u>Id.</u>)  Her family, including her mother and sister, help her when she goes to the grocery store.  (<u>Id.</u>)  She no longer can do her former hobbies of gardening, playing pool, and swimming, although she tries to do some yard work.  (<u>Id.</u> at 69.)  She swims during the summer, and tries to do so for at least an hour a day.  (<u>Id.</u> at 69-70.)  She can walk no farther than one-half to one block.  (<u>Id.</u> at 69.)  Plaintiff smokes one-half pack of cigarettes a day.  (<u>Id.</u> at 71.)  When awake, she spends three-quarters of the time – approximately ten hours – lying down.  (<u>Id.</u> at 71-72.)

Mr. Weimholt testified as a vocational expert (VE).  He characterized Plaintiff's past work as a cashier or checker for a grocery store as light and semi-skilled.  (<u>Id.</u> at 75.)  Her job as a quality control inspector as she described it was sedentary with an alternate sit-and-stand option.  (<u>Id.</u> at 76.)  It would be medium work.  (<u>Id.</u>)

Charles Shaw, Plaintiff's husband, and James Israel, L.P.C.,[7] C.V.E.,[8] C.R.C.,[9] testified at the second, September 2011 hearing.[10]

Mr. Shaw testified that he and Plaintiff had been married approximately fourteen and one-half years. (Id. at 43.) His wife currently spends most of her time laying down. (Id.) He estimates that she spends twelve to fifteen hours a day lying on the sofa. (Id.) Before her back injury, she did household chores. (Id.) Now, he does the chores. (Id.) Plaintiff will cook a meal, but it takes a while because she has to stop and sit or lie down. (Id. at 44.) She does not do the laundry or help give the children a bath. (Id.)

Testifying as a VE, Mr. Israel described Plaintiff's past work as a cashier or checker and in quality control as semi-skilled and, as it was actually performed, medium. (Id. at 46.)

He was then asked by the ALJ to assume a hypothetical claimant who was able to lift and carry twenty pounds occasionally and ten pounds frequently; who could stand or walk for a total of two hours and sit for a total of six hours in an eight-hour day with normal breaks; who was limited to no more than occasional bending, twisting, or squatting; who was also limited to no more than occasional pushing or pulling with the lower extremities; who could not crawl or climb ladders or scaffolds; who could only rarely stoop, kneel, or crouch;

---

[7]Licensed Professional Counselor.

[8]Certified Vocational Evaluator.

[9]Certified Rehabilitation Counselor.

[10]Plaintiff briefly testified only to identify a photograph she had taken of a sofa on which she stated she lay down for eight to ten hours a day. (Id. at 41-42.) The photograph is on page 241 of the record.

who should avoid all exposure to hazards; who could not drive or operate motorized vehicles on the job; and who was limited to jobs that involved only minor changes in the work setting from day to day.  (Id. at 46-47.)  Mr. Israel testified that this person could not perform Plaintiff's past relevant work.  (Id. at 47.)  If this person had Plaintiff's vocational capabilities, age, education, and work experience, this person could perform other jobs.  (Id.)  For instance, there were jobs in assembly and production, *Dictionary of Occupational Titles* (DOT) 734.687-018, and product inspector, DOT 669.687-014, that she could perform.  (Id.)

If this hypothetical person also needed a sit-stand option, those jobs would be eliminated.  (Id.)  And, no other work would be available.  (Id. at 48.)  There would also be no jobs available for someone who needed to lie down on the job for extended periods of time every day.  (Id.)

Mr. Israel further stated that his testimony was consistent with the DOT and with the *Selected Characteristics of Occupations*.  (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and various assessments of her physical or mental capabilities.

When applying for DIB, Plaintiff completed a Disability Report.  (Id. at 191-98.)  Her impairments, see pages one to two, supra, limit her ability to work by causing a limp, severe pain with any repetitive bending, and pain if she sits for longer than thirty minutes or walks farther than one-half block.  (Id. at 192.)  These impairments first bothered her on August 1,

2009, and caused her to be unable to work that same day. (Id.) She had stopped working, however, on February 1, 2008, when she was dismissed by her employer because of her condition.[11] (Id.) She had graduated from high school, and had not been in any special education classes. (Id. at 196-97.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application, explaining that, beginning approximately in October 2009, her pain level is higher and more constant. (Id. at 212-18.) She is more depressed and sleep-deprived. (Id. at 212.) She is not able to care for her personal hygiene. (Id. at 216.) It is painful for her to dress. (Id.) She can not walk for longer than fifteen to twenty minutes and is rarely able to sit or stand for any prolonged period. (Id.) She can not do such household chores as laundry; can not bend, twist, or lift repetitively; and can not lift anything heavier than five pounds. (Id.)

Plaintiff had reportable earnings in 1991 through 1997 and 1999 through 2007. (Id. at 179-80.) In the period from 1994 to 2007, inclusive, her highest earnings were in 2004 ($18,102[12]) and 2003 ($16,376). (Id.) Her lowest earnings were in 1999 ($1,172) and 2006 ($6,448). (Id.)

---

[11]A Report of Contact notes that Plaintiff filed a worker's compensation claim in June 2007 after falling in the store where she worked. (Id. at 208.) At the time of the first hearing, the claim was still pending.

[12]All amounts are rounded to the nearest dollar.

The medical records before the ALJ are summarized below in chronological order and begin with those relating to Plaintiff's fall on June 11, 2007, at the Save-A-Lot store where she worked.

Three days later, Plaintiff consulted Sudhir R. Raikar, M.D., about back pain exacerbated by standing or lying down. (Id. at 274-75.) On examination, straight leg raises were negative bilaterally.[13] (Id. at 274.) Her reflexes were symmetrical; her gait was slow. (Id.) Patrick's sign was negative.[14] (Id.) Her lower extremity strength was intact. (Id.) She was tender over the paraspinous muscles at L2 to S1. (Id.) His diagnosis was lumbar strain and thigh sprain. (Id. at 275.) He prescribed tramadol,[15] ibuprofen, and cyclobenzaprine[16] and scheduled Plaintiff for physical therapy three times a week for two weeks. (Id.) She was to lift nothing heavier than fifteen pounds, bend over no more than two times an hour, and push or pull with no more than thirty pounds of force. (Id.) She was to return in four days, and did, reporting that her medications had not helped. (Id. at 272-73, 275.) Although her gait was normal, she had a decreased range of motion and was able, with pain, to flex to

---

[13]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

[14]A positive Patrick's sign indicates the presence of sacroiliac joint dysfunction in patients with lower back pain. Patrick's Test: Evaluation of Sacroiliac Joint Dysfunction, http://stemcelldoc.wordpress.com/2009/03/30/patricks-test-evaluation-of-sacroiliac-joint-dysfuncti on/test (last visited May 8, 2013).

[15]Tramadol is prescribed for the relief of moderate to severe chronic pain. Physicians' Desk Reference, 2888 (65th ed. 2011) (PDR).

[16]Cyclobenzaprine is used to relieve muscle spasms. See Amrix (cyclobenzprine hydrochloride extended release), http://www.medilexicon.com/drugs/amrix.php (last visited May 8, 2013).

sixty degrees and to extend to fifteen.  (Id. at 272.)  She also had pain with side bending on her right and left.  (Id.)  Dr. Raikar continued the medications and directed Plaintiff to start physical therapy.  (Id. at 272-73.)  Her work restrictions were as before.  (Id. at 273.)  The only diagnosis was lumbar strain.  (Id.)

Plaintiff began physical therapy two days later.  (Id. at 268-71.)  She had a second session on June 25.  (Id. at 265-67.)  The same day, she was seen by Dr. Raikar.  (Id. at 264.)  She reported that neither the medications nor the physical therapy had improved her pain.  (Id.)  On examination, bilateral straight leg raises and her gait were normal.  (Id.)  Her range of motion was decreased as before.  (Id.)  She was continued on her medications, physical therapy, and work restrictions.  (Id.)

Plaintiff participated in physical therapy sessions on June 28, June 29, July 2, and July 3.  (Id. at 255-63.)  At the June 28 session, she reported some improvement.  (Id. at 262.)  She still had a lot of stiffness, but the pain was sporadic and the sharpness was occasional.  (Id. at 262.)  She continued to have pain when bending.  (Id.)  On June 29, however, she reported having a lot of pain after the previous day's session.  (Id. at 260.)  On July 2, she reported that bending and straightening up to a neutral position was painful.  (Id. at 258.)  On July 3, she reported a ten percent improvement in her pain.  (Id. at 255.)  She continued to have pain with repetitive bending, lifting, and twisting.  (Id.)

Plaintiff saw Debabrata Banerji, M.D., another physician in Dr. Raikar's practice, on July 6.  (Id. at 254.)  Her pain was primarily in her right lower back, occasionally radiating down her right leg to the knee.  (Id.)  She did not appear to be in any distress.  (Id.)  Bending

was painful.  (Id.)  Hip movements were normal on both sides.  (Id.)  Her work-related lifting restriction was increased to twenty pounds, her bending to no more than six times an hour, and her pushing-pulling force restriction to fifty pounds.  (Id.)

Plaintiff participated in physical therapy sessions on July 10 and July 12.  (Id. at 248-53.)  At the second session, she reported a twenty to thirty percent improvement "overall."  (Id. at 248.)  She continued to complain of pain in her bilateral lumbosacral region with repetitive bending, lifting, and twisting.  (Id.)  She could flex to seventy-five percent with complaints of pain.  (Id.)  Straight leg raises were positive on the right and accompanied by a feeling of pressure on the left.  (Id.)  When leaving the session, she had a gait with decreased weight-bearing on her right.  (Id.)

She saw Dr. Raikar the same day, reporting no improvement with either the medications or the physical therapy.  (Id. at 246-47.)  On July 30, she saw Dr. Raikar again.  (Id. at 244-45.)  She continued to have lower back pain, although it no longer radiated to her right thigh.  (Id. at 244.)  Her gait appeared to be normal.  (Id.)  There was moderate tenderness over her paraspinous muscles bilaterally from L3 to S1.  (Id.)  Her straight leg raises were slightly positive on the right side.  (Id.)  Her reflexes were normal bilaterally.  (Id.)  She had a full range of motion in her lower extremities; the range of motion in her lumbar spine was as restricted as before.  (Id.)  A magnetic resonance imaging (MRI) of her lumbar spine revealed degenerative changes at L4-5 and L5-S1 with some facet arthropathy, mild narrowing of the canal, and some foraminal narrowing without focal disc herniation or a severe degree of central spinal stenosis.  (Id. at 242.)  She was continued on the ibuprofen

and was to take Skelaxin[17] when the prescription for cyclobenzaprine, described by Plaintiff as being ineffectual, ran out. (Id. at 244-45.) Her lifting and pushing/pulling restrictions were as before. (Id. at 245.) She was limited to bending no more than four times per hour. (Id.) Also, she was referred to a physiatrist, Dr. Kharlton. (Id.)

At the request of Save-A-Lot's counsel, Plaintiff underwent an independent medical evaluation on October 3 by James Doll, D.O. (Id. at 320-23.) On examination, she "was tender[ ] to palpation diffusely though more focal over the right lumbosacral region and the right sacroiliac joint." (Id. at 322.) She was moderately limited in her range of motion in her lumbar spine, although more so on the right than on the left. (Id.) She had no focal muscle spasms, trigger point formations, or focal spinous process tenderness. (Id.) Pelvic rocking produced right lumbosacral pain, but was asymptomatic on the left. (Id.) Straight leg raises were positive, but did not induce radicular symptoms. (Id.) Patrick's test was positive for right lumbosacral pain and was also asymptomatic on the left. (Id.) Deep tendon reflexes were present and symmetric. (Id.) She walked with a mild antalgic gait favoring her right lower extremity. (Id.) Dr. Doll's impression was of persistent right lumbosacral pain and lumbar spondylosis. (Id.) He recommended a sacroiliac joint injection, continued physical therapy; he prescribed anti-inflammatories and muscle relaxants. (Id. at 323.) He opined that she would be able to return to her regular work activities without restrictions and would have no permanent partial disability. (Id.)

---

[17]Skelaxin "is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful, musculoskeletal conditions." PDR at 1732.

On November 6, Dr. Doll administered a right sacroiliac joint injection to Plaintiff. (Id. at 276, 319, 329, 327.)  She was prescribed ibuprofen and Skelaxin.  (Id. at 327.)  She could return to work with limitations of no lifting of anything heavier than ten pounds and no repetitive bending.  (Id.)

Plaintiff began physical therapy the next day.  (Id. at 308.)  She complained of pain across her low back, weakness in her lower extremities, and intermittent sharp pain down her anteriolateral right leg.  (Id.)  She rated her current level of pain as a six on a ten-point scale, at its lowest as a five, and at its worst as a ten.  (Id.)  She walked with a slow, guarded gait with a right antaliga.  (Id.)  On range of motion testing, she was limited to sixty percent on flexion, twenty-five percent on right and left extension, and fifty percent on right and left rotation.  (Id.)  The physical therapist described Plaintiff's subjective reports as being consistent with her behavior and function, with the exception of her pain ratings.  (Id.)  These the therapist found to be "high considering [Plaintiff] was interacting humorously with clinical staff."  (Id.)  After seven sessions, Plaintiff's range of motion had not improved.  (Id. at 306-07.)  The therapist noted that Plaintiff had complained on November 9 of pain after walking five minutes on the treadmill at .8 miles per hour, but had on November 14 related walking at the mall for about four hours.  (Id. at 307.)  She had been able to lift twenty pounds fifteen times three days earlier, but with poor form.  (Id.)

When Plaintiff saw Dr. Doll again, on November 26, she reported an improvement after the injection, but continued to have right lumbosacral pain.  (Id. at 317-18, 328, 328.)  She had also had some improvement with physical therapy.  (Id. at 317.)  She had a full range

of motion in her lumbar spine, albeit with right lumbosacral discomfort at the end of the range.  (Id.)  "[M]yofascial trigger points on palpation reproduced the majority of her pain complaints."  (Id.)  Dr. Doll modified his prior diagnosis of persistent right lumbosacral pain to be "[i]mproved right sacroiliac joint pain with persistent right lumbosacral myofascial pain and trigger point injections."  (Id.)  It was decided that she would have no more sacroiliac joint injections. (Id.)  She was, however, given trigger point injections. (Id. at 317-18.)  She was to continue with physical therapy.  (Id. at 318.)  Her prescription for Skelaxin was changed to Soma to address her concerns about the Skelaxin making her sleepy.  (Id.)  Dr. Doll issued the employer a work status report, reporting that Plaintiff's diagnosis was improving right-sided lumbosacral pain and right sacroiliac joint pain.  (Id. at 326, 328.)  Her work limitations were continued.  (Id.)

On December 7, after Plaintiff had attended three more sessions, the therapist reported to Dr. Doll that Plaintiff did not appear to be making much progress.  (Id. at 304.)

Plaintiff was seen again by Dr. Doll on December 11.  (Id. at 315-16, 325.)  She reported that she had had only one to two days of improvement after the injection and none from physical therapy.  (Id. at 315.)  She also reported tenderness to palpation in her right lumbosacral region; however, Dr. Doll could identify no bony asymmetrics, muscle spasms, or trigger point formations.  (Id.)  Passive trunk rotation testing was positive bilaterally; axial compression testing and straight leg raises were negative.  (Id.)  Dr. Doll recommended a work hardening program.  (Id. at 315.)  He issued a work status report, increasing Plaintiff's

lifting allowance to no more than fifteen pounds. (Id. at 325.) She was not to do any repetitive bending, twisting, or squatting. (Id.)

Subsequently, Plaintiff was evaluated for a work hardening program. (Id. at 290-302.) Her results, 60 percent, on the Modified Oswestry Low Back Pain Disability Questionnaire (Oswestry)[18] "indicate[d] a severe to crippled level of self-perceived disability." (Id. at 290.) On testing, she "displayed slow guarded movements with low back involvement." (Id.) She failed four of thirteen Symptom Magnification Indicators; this score reflected "valid overall effort." (Id. at 290-91.) Her scores on subjective reports, including pain reports, did not always correlate with her functioning and observed behaviors. (Id. at 290.) It was recommended that she participate in the work hardening program three times a week for two weeks. (Id.) Her long-term goals included (1) returning to full-duty work at the light exertional level, (2) increasing her endurance, (3) increasing her ability to constantly stand, bend, and reach forward, and (4) increasing her ability to occasionally lift up to twenty pounds from the floor to her waist. (Id. at 302.) At the end of five sessions, Plaintiff had not

---

[18]The Oswestry questionnaire is

"a patient questionnaire which contains six statements (denoted by the letters A through F) in each of ten sections. The questions concern impairments like pain, and the ability to cope with such things as personal care, lifting, reading, driving, and recreation. For each section, the patient chooses the statement that best describes their status. The designers of the test interpret "percentage of disability" scores in this manner: 0% to 20%— minimal disability; 20% to 40%—moderate disability; 40% to 60%—severe disability; 60% to 80%—crippled; and 80% to 100%—bed bound (or exaggerating symptoms)."

Dale v. Astrue, 2011 WL 2621539, *4 n.8 (E.D. Mo. July 5, 2011) (quoting MacDonald v. Astrue, 2007 WL 1051507, *2 n.4 (D. Mass. Apr. 4, 2007)).

met all but the fourth goal.  (<u>Id.</u> at 277-89.)  Her score on the Oswestry, 54 percent, still reflected a severe level "of self-perceived disability."  (<u>Id.</u> at 277.)  Her scores on the subjective reports were inconsistent as before.  (<u>Id.</u>)  Her scores on a right grip test indicated "less than maximal effort."  (<u>Id.</u>)  She was assessed as having the ability to safely perform work up to the medium work demand level.  (<u>Id.</u>)  This did not, however, meet the demands of her job that she wished to return to and as she described it.  (<u>Id.</u>)  It was noted that the job of grocery checker was described in the <u>DOT</u> as being light work.  (<u>Id.</u>)

After completing the work hardening program, Plaintiff returned to Dr. Doll on January 10, 2008, for a follow-up evaluation.  (<u>Id.</u> at 313-14, 324.)  Noting Plaintiff's results on the validity criteria as reported by the work hardening program, Dr. Doll concluded that she did not have "any objective findings that would preclude her performing her regular work activities and . . . may return to regular activities without restriction at this time."  (<u>Id.</u> at 313.)  He listed no restrictions on the work status report and prescribed only over-the-counter medications to be taken as tolerated.  (<u>Id.</u> at 324.)  Plaintiff refused to sign this report.  (<u>Id.</u>)

Plaintiff consulted Theodore Schuerman, M.D., on April 17 to establish a treatment relationship.  (<u>Id.</u> at 330-32, 427-28.)  She reported low back pain, spasms, and shooting pain in her left leg.  (<u>Id.</u> at 332.)  Her current medications were over-the-counter and included ibuprofen, Allegra, and Zantac.  (<u>Id.</u>)  Her chronic problems included lumbago, obesity, and tobacco use disorder.  (<u>Id.</u> at 330.)

On Dr. Schuerman's referral, Plaintiff consulted Mahendra Gunapooti, M.D., on June 18 for pain management.  (<u>Id.</u> at 376-77.)  Her only medication was ibuprofen.  (<u>Id.</u> at 376.)

Her range of motion in her lumbar spine was within normal limits, but painful. (Id.) She had slight tenderness on palpation over the lumbar paraspinal region. (Id.) Patrick's test and straight leg raises were negative. (Id.) Her deep tendon reflexes were symmetrical and equal. (Id.) She had full motor strength in her lower extremities. (Id.) After reviewing Plaintiff's July 2007 MRI, Dr. Gunapooti diagnosed her with chronic left lumbar radiculopathy and lumbar degenerative disc disease at L4-5 and L5-S1, with bulging disc. (Id. at 377.) A transforaminal selective nerve block was recommended, and was given on July 9, October 15, November 24, and January 26, 2009. (Id. at 372-76.)

On February 25, Dr. Gunapooti examined Plaintiff, noted her frustration with her pain, prescribed Lorcet[19] and Flexeril (cyclobenzaprine), advised her to stop smoking, and scheduled her for a new MRI. (Id. at 369.) This MRI revealed straightening of the normal lumbar curvature; mild multilevel degenerative disc disease, greatest at L5-S1; and mild multilevel facet osteoarthritis. (Id. at 335, 366.)

Plaintiff returned to Dr. Gunapooti in March [24], complaining of "chronic mild to moderate low back pain with radiation to left lower extremity up [sic] to foot as well intermittent tingling/numbness." (Id. at 368.) Dr. Gunapooti recommended a left L5-S1 transforaminal selective nerve block under fluoroscopy. (Id.) One was given on April 20 and again on June 4. (Id. at 370-71.) Plaintiff reported to Dr. Gunapooti in July that she did not have any tingling or numbness and her leg pain was better. (Id. at 367.) Her low back pain

_____

[19]Lorcet is a combination of hydrocodone and acetaminophen used for the relief of moderate to moderately severe pain. See Lorcet, http://www.drugs.com/search.php?searchterm=lorcet (last visited May 8, 2013).

continued.  (Id.)  Dr. Gunapooti decided to send her for a neurological consultation with James J. Lu, M.D.  (Id.)

Subsequently, in September, Plaintiff saw Dr. Lu.  (Id. at 350, 352-54.)  On examination, Hoffman's signs were absent[20]; straight leg raises produced pressure in the lower back but no symptoms in the lower extremities; Patrick's test was negative bilaterally; and her gait and station were normal.  (Id. at 352-53.)  Dr. Lu opined that Plaintiff's symptoms were "most likely . . . secondary to the degenerative disc disease and degenerative changes seen [on the March 2009 MRI] at the L5-S1 segment."  (Id. at 352.)  He recommended a surgical procedure; she agreed.  (Id.)  Consequently, on September 28, Dr. Lu performed a complete left-sided facetectomy[21] and decompressive hemilaminectomy[22] at L5-S1; a radical diskectomy and transforaminal lumbar interbody fusion at L5-S1; and a bilateral L5-S1 pedicle screw fixation and posterolateral arthrodesis.[23]  (Id. at 336-49, 352.)  X-rays of her lumbar spine at the conclusion of the procedure showed a normal alignment.  (Id. at 349.)  On discharge, Plaintiff was prescribed Percocet[24] and Flexeril, restricted to lifting nothing

_____

[20]A positive Hoffman's sign is indicative of an upper motor neuron lesion from spinal cord compression.  Clifford R. Wheeless, III, M.D., Hoffman's Sign, http://www.wheelessonline.com/ortho/hoffmans_sign (last visited May 8, 2013).

[21]A facetectomy is the "[e]xcision of a facet," which is "[a] small smooth area on a bone . . . ."  Stedman's Medical Dictionary, 619 (26th ed. 1995) (Stedman's).

[22]A hemilaminectomy is the "[r]emoval of a portion of a vertebral lamina [a thin plate or flat layer], usually performed for exploration of, access to, or decompression of the intraspinal contents."  Stedman's at 775, 932.

[23]Arthrodesis is "[t]he stiffening of a joint by operative means."  Stedman's at 150.

[24]Percocet is prescribed for the relief of moderate to moderately severe pain.  PDR at 1096.

heavier than ten pounds, prescribed a lumbar brace to wear for six weeks during ambulation and activity, and advised to avoid bending, twisting, and all strenuous activity.  (Id. at 344.)  She was to return for a follow-up visit in two weeks.  (Id.)

Plaintiff saw Dr. Lu again on October 13, reporting improved back pain and worse left lower extremity pain.  (Id. at 351.)  Dr. Lu attributed the latter to "intraoperative manipulation and postoperative inflammation in the area of the left-sided nerve root."  (Id.)  He prescribed Dexpak,[25] refilled the Percocet prescription, and recommended physical therapy.  (Id.)

Between November 2 and December 22, Plaintiff attended twelve of thirteen physical therapy sessions.  (Id. at 386-409.)  At her last session, she complained of pain that was a five on a ten-point scale.  (Id. at 386.)  She demonstrated full lower extremity manual muscle test strength with the exception of her left hip flexion, which was 4/5.  (Id.)  She also demonstrated pain bilaterally at thirty degrees with straight leg raises.  (Id.)

Plaintiff informed Dr. Lu on November 14 that there was no improvement in her symptoms.  (Id. at 379, 430.)  She continued to have constant pain in her low back, was having some pain in her right lower extremity, and continued to have pain in her left lower extremity.  (Id.)  She appeared uncomfortable and was "generally stiff."  (Id.)  On examination, she had normal strength and tone, intact sensation to light touch, symmetrical reflexes, negative straight leg raises, no Hoffman's signs, and a normal gait and station.  (Id.)  Dr. Lu recommended an MRI and thought it likely that he would refer her back to Dr.

_____

[25]Dexpak is a steroid prescribed to "prevent[] the release of substances in the body that cause inflammation."  Dexpak, http://www.drugs.com/search.php?searchterm=dexpak (last visited May 8, 2013).

Gunapooti.  (Id.)  The MRI of Plaintiff's lumbar spine was performed in December, revealing moderate to severe left lateral recess stenosis at L4-L5 with lateral disc herniation on the left with facet arthropathy and resulting in a mild to moderate left neural foraminal stenosis.  (Id. at 364-65, 380-82, 431-33.)  Dr. Lu described these findings as "generally benign."  (Id. at 378, 383, 429, 433.)  He recommended continued conservative treatment and, on November 24, gave Plaintiff a prescription for Percocet for pain control.  (Id.)

Plaintiff consulted Laila Saied, M.D., a physician at Barnes Jewish Hospital (Barnes) on June 1, 2010, to establish care and for treatment of her back pain.  (Id. at 502-13, 516-25.)  She reported that she had difficulty walking, getting dressed, remembering, and with activities of daily living, including cooking, cleaning, shopping, and driving.  (Id. at 510.)  She was able to prepare balanced meals.  (Id.)  She further reported that her back pain had worsened and her leg pain had improved after she had lumbar fusion surgery in 2009.  (Id. at 512.)  Her "[a]ctive [p]roblems" included lower back pain, asthma, irritable bowel syndrome, and depression.  (Id.)  She was tender to palpation over the L5 midline and laterally; had pain with passive elevation of her left leg at thirty degrees and of her right at ten; and had spasms of her paraspinal muscles.  (Id. at 513.)  Her reflexes in her lower extremities were diminished.  (Id.)  Her strength was intact.  (Id.)  She was started on gabapentin and referred to a pain clinic.  (Id.)  She was to return in two to three months.  (Id. at 513.)  She was interested in quitting smoking – she had a history of smoking one to two pack of cigarettes a day for fifteen years.  (Id. at 510.)

Plaintiff returned to Dr. Saied on October 19. (Id. at 489-501, 527-39.) She "self-rate[d]" her low back pain as a five on a ten-point scale." (Id. at 493.) She was not interested in quitting smoking. (Id.) She had reduced the medication she was taking for anxiety, fluoxetine (Prozac), by half and was continuing to have anxiety symptoms. (Id. at 494.) She slept three hours. (Id.) Her back pain was a five and was secondary to an accident in 2007. (Id. at 495.) Her prescription for fluoxetine was replaced with one for sertraline. (Id. at 495.) Her dosage of gabapentin was doubled from that she was formerly prescribed.[26] (Id. at 494, 495.) She was to return in three months. (Id. at 492.)

Also before the ALJ were various assessments of the causes of Plaintiff's impairments and their resulting limitations.

Pursuant to her DIB application, Plaintiff was evaluated in November 2009 by Arjun Bhattacharya, M.D. (Id. at 357-63.) Noting that Plaintiff had undergone spinal surgery only five weeks earlier, Dr. Bhattacharya described her as being in "considerable discomfort." (Id. at 358.) Plaintiff reported that she could walk no farther than ten feet, stand no longer than ten minutes, and sit no longer than twenty minutes. (Id. at 357.) She could not lift or bend, and she used a walker for ambulation. (Id.) Her sleep was intermittent. (Id.) She did light housework such as cooking, but no laundry or cleaning. (Id. at 357-58.) On examination, she had "significant spasm" from her lumbar area to her left hip; restricted ranges of motion; and difficulty lying on her back. (Id. at 359.) Active or passive movements for range of

---

[26]Her prescribed dosage had been 300 milligrams twice a day. She had increased it to four times a day. Her new prescription was for 600 milligrams twice a day.

motion could not be tested because of her recent surgery and pain.  (Id.)  She had no evidence of atrophy in her lower extremities.  (Id.)  Deep tendon reflexes were restricted in both her lower extremities.  (Id.)

At the request of the attorney representing Plaintiff in her worker's compensation claim against Save-A-Lot,[27] Plaintiff was evaluated by Thomas F. Musich, M.D., on January 22, 2010.  (Id. at 410-16.)  After summarizing her medical records and her medical history, Dr. Musich noted her present complaints of constant low back pain that was a seven to nine on a ten-point scale.  (Id. at 410-13.)  She had daily, but not constant, complaints of pain and paresthesia in both lower extremities, greater on the left than on the right.  (Id. at 413.)  Her pain was aggravated by coughing, sneezing, twisting, repetitive bending, lifting anything heavier than eight pounds, and sitting longer than twenty minutes.  (Id.)  She took Percocet three times a day.  (Id.)  On examination, the range of motion in her lumbar spine was a maximum of thirty-seven degrees with end range pain; lumbar extension was twelve degrees with end range pain, lateral flexion bilaterally was seventeen degrees with end range pain; and straight leg raises were negative bilaterally with the exception of aggravated pain complaints relative to the lumbar spine.  (Id. at 414.)  She could not walk heel or toe due to low back pain.  (Id.)  Dr. Musich opined that Plaintiff's current condition was attributable solely to her June 2007 work-related injury.  (Id. at 415.)  He also opined that she should not operate commercial equipment and tools.  (Id.)

---

[27]See Record at 410 (Dr. Musich addressing report to Kurt Hoener), 439 (listing Mr. Hoener as the attorney representing Plaintiff at Dr. Musich's deposition in Plaintiff's worker's compensation claim case), and 219 (letter addressed to Mr Hoener from vocational rehabilitation evaluator).

The July 2010 deposition of Dr. Musich taken pursuant to Plaintiff's worker's compensation claim against Save-A-Lot was also before the ALJ. (Id. at 436-77.) Dr. Musich identified his January 2010 report as being prepared after evaluating Plaintiff for that claim. (Id. at 444-45.) He affirmed his findings and conclusions in his report. (Id. at 45658.) He testified that he had not treated Plaintiff. (Id. at 456.) He further testified that he believed she had not been able to return to work after 2008 due to "her ongoing complaints of low-back pain." (Id. at 459.) She might be able to return to work with a "successful vocational rehabilitation." (Id. at 460.) He did not know if Plaintiff smoked, but testified that patients who use tobacco are at an increased risk for the development of lumbar spine problems. (Id. at 470.) He had not given Plaintiff any specific exertional limitations, e.g., lifting or bending restrictions, because he believed people should be as active as their pain allowed. (Id. at 473.)

Three months earlier, on April 20, at the request of Plaintiff's former employer's counsel, she underwent an evaluation by Dr. Doll. (Id. at 480-86.) Plaintiff described her current pain as a five on a ten-point scale and generally as ranging from five to ten. (Id. at 481.) Her symptoms were made worse by bending, sitting, standing, lying flat, lifting, twisting, and sneezing. (Id.) They were made better by lying on her side or doing nothing. (Id.) She had numbness down her left leg to her foot, and, occasionally, in her right leg. (Id.) She had "a generalized feeling of weakness in [her] left leg and her back. (Id.) Her left leg pain had decreased after the surgery from a ten to a seven; it occurred less often when she was walking or standing. (Id.) Her back pain had increased from a five to a ten. (Id.) "[H]er

daily activities involve[d] primarily sitting and lying down." (Id. at 483.) She walked for approximately ten to fifteen minutes a day. (Id.) She avoided bending, and occasionally vacuumed and washed dishes. (Id.) Dr. Doll described his examination findings as follows.

> Her voluntary lumbar range of motion was minimal in all planes of motion secondary to her report of back pain. There was no palpable muscle spasming, trigger point formation, nor focal spinous process tenderness. There was no stepoff deformity. There was no sacroiliac joint tenderness or asymmetry during the standing forward flexion test. . . . .

> Straight leg raise test was negative bilaterally. Patrick's test negative bilaterally. Deep tendon reflexes were present and symmetric at 1/4 for bilateral knee extensors and plantar flexion. No sensory deficits were present during today's exam throughout the lower extremities. There was no peripheral edema, erythema, nor ecchymosis identified. Peripheral pluses were intact and symmetric with good capillary refill. She ambulated without antalgia though at a mildly slow cadence.

(Id. at 484.)

Dr. Doll concluded that Plaintiff had only one diagnosis related to her June 2007 work injury: lumbosacral contusion/strain. (Id.) He further concluded that the treatment she sought after attaining maximum medical improvement from her June 2007 injury was not medically necessitated by that injury, but was due to her "pre-existent and underlying degenerative condition in the lumbar spine . . . ." (Id. at 485.) She had no permanent partial disability attributable to that injury. (Id. at 486.) She had other diagnoses unrelated to her 2007 injury, including low back pain, left lower extremity pain, and multilevel degeneration of her lumbar spine, i.e., spondylosis. (Id. at 484.)

On being later asked if Plaintiff was able to work with or without restrictions, Dr. Doll wrote in July 2010 that she could work with restrictions of no lifting over forty pounds; no

- 23 -

repetitive bending, twisting, and squatting; and occasionally alternating between sitting and standing. (<u>Id.</u> at 487-88.)

At her worker's compensation claim counsel's request, Plaintiff underwent a vocational rehabilitation evaluation in September 2010 by James M. England, Jr., a vocational rehabilitation counselor. (<u>Id.</u> at 219-30.) He described her as "appear[ing] to be in a great deal of discomfort," having frequently to shift position, and getting up with difficulty from her chair at the end of the evaluation. (<u>Id.</u> at 219.) And, "[s]he walked with a noticeable limp." (<u>Id.</u>) After summarizing Plaintiff's medical records and her own report of her medical history, Mr. England noted her current complaints. (<u>Id.</u> at 219-27.) These complaints included a need to often change positions during the day and to avoid heights. (<u>Id.</u> at 227.) Vibrations, cold, and damp made her symptoms worse. (<u>Id.</u>) Her primary problem was the pain in her low back that radiated to her left leg. (<u>Id.</u>) The pain was worse when she was on her feet. (<u>Id.</u>) She could not stand for longer than twenty minutes before having to sit and could not walk for longer than ten to fifteen minutes. (<u>Id.</u>) She had difficulty rising from a kneeling or squatting position. (<u>Id.</u>) She could not lift anything heavier than ten pounds. (<u>Id.</u>) Repetitive use of her hands caused cramping and an inability to maintain her hold on things. (<u>Id.</u>) She could not sit for longer than five to ten minutes before having to shift positions. (<u>Id.</u> at 228.) She no longer went down to her basement because of the difficulties she has negotiating stairs. (<u>Id.</u>) Riding in a car for longer than fifteen to twenty minutes caused her pain level to increase "dramatically." (<u>Id.</u>) Also, her pain caused her problems with anxiety and moodiness. (<u>Id.</u>) Mr. England concluded as follows.

> [Plaintiff's] difficulty with sitting, getting up out of a chair and moving around would certainly be observable in a perspective [sic] job interview. This, combined with her size would make it very difficult for her to be picked over alternative job candidates, especially when she has no skill per se to make her particularly attractive to a new employer.
>
> More importantly, however, even sedentary to light types of work require normal attendance, good ability to focus and pay close attention to detail and would not allow a person to recline periodically to get through the day. As she actually appears to be functioning I do not see how she would be able to sustain work in the long run.

(Id. at 230.)

Thomas J. Spencer, Psy.D., evaluated Plaintiff in April 2011 pursuant to her DIB application. (Id. at 540-46.) Plaintiff reported sporadically experiencing depression and anxiety since 1997. (Id. at 540.) She believed that her symptoms had worsened since her fall. (Id.) She had trouble sleeping, constantly felt tense, was irritable, and had periodic crying spells. (Id. at 540-41.) She took Prozac, although it made "only 'a small difference.'" (Id. at 541.) She had tried committing suicide when she was eighteen by taking an overdose of antibiotics, and currently had "fleeting thoughts of suicide." (Id.) She did not, however, feel hopeless or helpless. (Id.) She had never seen a psychiatrist or psychologist. (Id.) Plaintiff and her husband had been together for approximately fifteen years and married for four. (Id.) They had three daughters. (Id.) Her longest period of employment had been four to five years. (Id.) She abused alcohol for a time after the accident. (Id. at 542.) She had a civil claim pending against Save-A-Lot. (Id.) "[S]he spen[t] her day lying or sitting on the couch." (Id.) "With pain comes less activity." (Id.) She needed assistance with household tasks. (Id.) On examination, her eye contact was good; her speech was within normal limits;

and her flow of thought was intact and relevant. (Id.) She ambulated without assistance, although she appeared "to be in some degree of physical distress as she stood a couple of times." (Id.) Although she had "a bright affect and joked frequently," she described her mood as "'tired and irritable.'" (Id.) She was alert and oriented to person, place, time, and event. (Id.) She appeared to be of average intelligence. (Id.) Dr. Spencer diagnosed Plaintiff with chronic adjustment disorder and depression/anxiety. (Id.) He rated her Global Assessment of Functioning as 55 to 60.[28] (Id.)

Completing a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Spencer opined that Plaintiff's impairments did not affect her ability to (1) understand, remember, and carry out simple instructions and (2) make judgments on simple work-related decisions. (Id. at 544-46.) The impairments mildly affected her ability to (1) understand, remember, and carry out complex instructions and (2) make judgments on complex work-related decisions. (Id. at 544.) Plaintiff's impairments also mildly affected her ability to interact appropriately with supervisors, co-workers, and the public. (Id. at 545.) They moderately affected her ability to respond appropriately to usual work situations and

---

[28]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

to changes in a routine work setting.  (Id.)  Her impairments also resulted in a decrease in her persistence and pace.[29]  (Id.)

A Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed in February 2010 by Donald Pfleger, a single decisionmaker.[30]  (Id. at 417-23.)  The primary diagnosis was degenerative disc disease of the lumbar spine and status-post lumbar spine laminectomy and spinal fusion; the secondary diagnosis was obesity.  (Id. at 417.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally and frequently lift or carry ten pounds; stand or walk about two hours in an eight-hour day; and sit for about six hours during that same period.  (Id. at 418.)  Except for the restriction on the amount of weight she could lift or carry, her ability to push or pull was unlimited.  (Id.)  She had postural limitations of never climbing ropes, ladders, or scaffolds and only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  (Id. at 419.)  She had no manipulative, visual, or communicative limitations.  (Id. at 419-20.)  She should avoid concentrated exposure to vibrations.  (Id. at 420-21.)

---

[29]The remainder of Dr. Spencer's handwritten comments are illegible.

[30]See 20 C.F.R. § 404.906 (defining role of single decision-maker under proposed modifications to disability determination procedures).  See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

## The ALJ's Decision

The ALJ first determined that Plaintiff had met the insured status requirements of the Act through May 10, 2011, and had not engaged in substantial gainful activity since her amended alleged onset date of February 1, 2008. (Id. at 18.) The ALJ next found that, during the period from February 1, 2008, through April 20, 2010, Plaintiff had severe impairments of degenerative disc disease, degenerative disease of the spine, an adjustment disorder, depression, and obesity. (Id.) These impairments did not meet or medically equal an impairment of listing-level severity. (Id.) During this period, she had the residual functional capacity (RFC) to perform sedentary work[31] except she occasionally needed an assistive device to ambulate and was unable to sustain attention for a full eight-hour workday due to her pain and restrictions. (Id.) She was then unable to return to her past relevant work and, with her age, education, work experience, and RFC, unable to perform any other job that existed in significant numbers in the national economy. (Id. at 21-22.) She was, therefore, under a disability during this period. (Id. at 22.)

The ALJ next determined that Plaintiff had not developed any new impairment or impairments after April 20, 2010. (Id.) And, beginning on that date, she did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity. (Id.) Specifically, her spinal impairments did not satisfy Listing 1.04. (Id. at 22-23.) Nor did she show that her back problems "have resulted in [an] inability to

---

[31]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

effectively engage in fine or gross motor function." (Id. at 23.) Her obesity, albeit severe, was not "accompanied by significant joint disease or degenerative disc disease." (Id.) It has not caused such impairments as reduced respiratory capacity, coronary artery disease, or diabetes mellitus. (Id.) Her mental impairment, i.e., adjustment disorder, did not satisfy the criteria of paragraphs "A", "B", or "C" of Listing 12.04. (Id. at 23-24.) Addressing the "B" criteria, the ALJ found that Plaintiff had no more than a mild restriction in her activities of daily living; mild limitations in social functioning and concentration, persistence, and pace; and no episodes of decompensation for an extended period. (Id. at 24.) He noted that she took care of her three children, prepared all meals, did housework, although with some limitations, and swam every day in the summer for an hour. (Id.)

As of April 21, 2010, Plaintiff had medically improved, resulting in an increase in her RFC. (Id. at 24-25.) After summarizing the medical records relating to her treatment after the September 2009 surgery, the ALJ concluded that, having improved, Plaintiff had the RFC to perform light work except she could only occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for two hours in an eight-hour day; sit for approximately six hours in an eight-hour day; and occasionally bend, twist, squat, and push or pull with the legs or feet. (Id. at 25-27.) She could not climb, crawl, or be exposed to hazards. (Id. at 27.) She must work in a setting with few changes in the daily routine. (Id.) After noting the *Polaski* requirements,[32] the ALJ concluded that, to the extent Plaintiff's

---

[32]See page 32, infra.

subjective complaints were inconsistent with this RFC, they were not credible. (Id. at 19, 27.)

With this RFC, however, Plaintiff was unable to return to her past relevant work. (Id. at 28.) She could perform jobs that existed in significant numbers in the national economy, as described by Mr. Israel. (Id.) Plaintiff was not disabled after April 21.2010. (Id. at 29.)

### Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix**

**v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description

of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord

**Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See also</u> 20 C.F.R. § 404.1520(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from

that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred by (1) not basing his RFC findings on substantial evidence on the record as a whole because (a) there is no such evidence to support the ALJ's findings of medical improvement after April 20, 2010, (b) the findings of Dr. Doll on which the ALJ relied are illogical and unsupported, and (c) the findings do not include additional limitations that are supported by the record, e.g., her need to lie down; (2) failing to properly weigh the medical evidence in the record and to develop a full and fair record by ordering a consultative examination to resolve conflicts between the findings of Drs. Doll and Musich; (3) not including additional mental limitations in his RFC findings; and (4) not sufficiently addressing all the relevant criteria when assessing her credibility. To succeed on any of her arguments, Plaintiff must prevail either in her challenge to the ALJ's reliance on the opinion of Dr. Doll over that of Dr. Musich or to the ALJ's assessment of her credibility.

Drs. Doll and Musich. Dr. Doll first examined Plaintiff in October 2007 at the request of the attorney representing her employer in her worker's compensation claim. After that examination, he opined that she could return to work in the future without restrictions. The following month, he gave her a sacroiliac joint injection, prescribed ibuprofen and Skelaxin, and released her to return to work with limitations of not lifting anything heavier than ten pounds and no repetitive bending. Also pursuant to his recommended course of treatment, she participated in physical therapy. Three weeks later, she again saw Dr. Doll, reporting some improvement after the injection and after physical therapy. He gave her a trigger point injection, recommended she continue with physical therapy, and prescribed her Soma to replace the Skelaxin. The following month, he saw Plaintiff again and increased her lifting restriction at work to fifteen pounds. After examining Plaintiff in January 2008, Dr. Doll released her to return to work without restrictions. Only over-the-counter medications were prescribed.

Dr. Doll next saw Plaintiff on April 20, 2010. This visit was for an evaluation performed at the request of Plaintiff's former employer's counsel. His examination findings included negative findings bilaterally on straight leg raises and Patrick's test. There were no muscle spasms, peripheral swelling, or sensory deficits. She walked slowly, but without a limp. Her range of motion in her lumbar spine was limited by her complaints of back pain. He concluded that she could work with restrictions of not lifting anything heavier than forty pounds and of no repetitive bending, twisting, or squatting. Also, she needed to occasionally alternate between sitting and standing.

Dr. Musich also examined Plaintiff pursuant to her worker's compensation claim. He reported that her pain was aggravated by lifting anything heavier than eight pounds and sitting longer than twenty minutes. The basis for these restrictions is clearly Plaintiff's own description of her limitations, as is evident by Dr. Musich's deposition testimony that he had not given Plaintiff any exertional limitations because he believed people should be as active as their pain permitted. Regardless, he opined that Plaintiff would be unable to return to work without successfully undergoing a work hardening program.

The focus of Dr. Musich's January 2010 examination and of Dr. Doll's April 2010 examination was the extent to which Plaintiff was impaired by her 2007 injury. Plaintiff contends the ALJ erred by not crediting Dr. Musich's findings over those of Dr. Doll. As noted by the ALJ, however, Dr. Musich found that Plaintiff was unable to work as of January 2010.[33] The ALJ agreed. Dr. Musich also found that Plaintiff would be unable to return to work without a successful work hardening program. The ALJ implicitly disagreed when finding that Plaintiff was no longer disabled as of April 21, 2010, although she had not participated in such a program. On April 20, 2010, Dr. Doll released Plaintiff to return to work with several restrictions. The ALJ found this conclusion to be supported by the record. The Court agrees. Dr. Doll's examination findings, e.g., a normal, but slow, gait, negative straight leg raises, are consistent with Dr. Lu's examination findings following Plaintiff's surgery of normal strength and tone, negative leg raises, absent Hoffman's signs, and normal

---

[33]The Court notes that the ALJ mistakenly referred to Dr. Musich as being a consultative examiner for Plaintiff's *employer's* insurance company.

gait and station. Moreover, Dr. Lu described the results of the MRI performed the following month as "generally benign." (R. at 378.) He then recommended conservative treatment and prescribed Percocet.

Plaintiff did not seek medical treatment again until June 2010. There is no reference in the records of that visit to her currently taking Percocet; her only currently prescribed medication was fluoxetine. She next sought medical treatment four months later – one month after the time recommended.

It is for the ALJ "'to resolve conflicts among the opinions of various treating and examining physicians.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting Pearsall, 274 F.3d at 1219); accord **Wagner**, 499 F.3d at 848. Dr. Musich, examining Plaintiff at the request of her worker's compensation attorney, opined in January 2010 that she was then unable to work due to her June 2007 injury. Dr. Doll, examining Plaintiff at the request of her former employer's attorney, opined four months later that she could return to work, albeit with some restrictions. Dr. Doll had earlier examined *and* treated Plaintiff. Dr. Musich had not treated Plaintiff, as he acknowledged in his deposition. Dr. Doll's findings were consistent with those of Dr. Lu's, with the absence in the record of any medical treatment sought by Plaintiff between her November 2009 last visit to Dr. Lu and her June 2010 first visit to Dr. Saied, and with the objective medical findings. Where one physician's findings are "supported by better or more thorough medical evidence," the ALJ does not err in giving greater weight to that physician's findings than to one whose findings are not so supported. **Id.** at 849 (internal quotations omitted).

Plaintiff further argues the ALJ erred when giving Dr. Doll's opinion greater weight than Dr. Musich because (a) Dr. Doll was biased and (b) reliance on Dr. Doll's opinion was illogical. Emphasizing that Dr. Doll examined Plaintiff at the request of her former employer, Plaintiff ignores evidence that (1) Dr. Doll had earlier treated Plaintiff, whereas Dr. Musich had seen her the one time only, and (2) the one time Dr. Musich had seen Plaintiff was for an examination performed at the request of her attorney for her worker's compensation claim. Consequently, any bias is just as likely to be on the part of Dr. Musich than on the part of Dr. Doll.

Nor does it follow that the ALJ must logically find that Dr. Doll was not credible because the ALJ's conclusion that Plaintiff was disabled prior to April 20, 2010, is inconsistent with Dr. Doll's January 2008 conclusion that she had reached maximum medical improvement. It was for the ALJ to make the determination whether Plaintiff was disabled under the Act. See **Perkins v. Astrue**, 648 F.3d 892, 898 (8th Cir. 2011). Finding that she was no longer disabled as of the time of Dr. Doll's April 2010 examination is not fatally inconsistent with Dr. Doll's January 2008 findings given her subsequent fusion surgery followed by medical records and treatment consistent with Dr. Doll's 2010 findings.

Plaintiff next argues that the ALJ should have ordered a consultative examination to resolve the conflict between the findings of Drs. Doll and Musich. Title 20 C.F.R. § 404.1519a(a) provides that a consultative examination may be ordered if the necessary information may not be obtained from the claimant's medical sources. "'[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for

him to make an informed decision.'" **Freeman v. Apfel**, 208 F.3d 687, 692 (8th Cir. 2000) (quoting Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)) (alteration in original). If, however, the medical records before the ALJ provide sufficient medical evidence to determine whether the claimant is disabled, a consultative examination is not required. **Martise v. Astrue**, 641 F.3d 909, 926-27 (8th Cir. 2011); accord **Johnson v. Astrue**, 627 F.3d 316, 320 (8th Cir. 2010); **Haley v. Massanari**, 258 F.3d 742, 749-50 (8th Cir. 2001). As explained above, there is no conflict requiring a consultative examination.

Plaintiff's Credibility. Plaintiff's arguments that the ALJ should have included in his RFC findings such limitations as her need to lie down and her mental limitations depend for their success on her being credible.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of

symptoms . . . that are reasonably attributed to a medically determinable impairment"). An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Depover**, 349 F.3d at 567. Instead, an ALJ who specifically addresses the areas in which he found a limitation and is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See also **Renstrom**, 680 F.3d at 1065 (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record"); **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (finding it "highly unlikely that the ALJ did not consider and reject" portions of report given the ALJ's explicit reliance on other portions of report).

Both the need to lie down and the mental limitations, including any confusion caused by a lack of sleep, are established only by Plaintiff's description of her limitations.[34] The ALJ discredited this description. "'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Gregg v.

---

[34]The Court notes that Plaintiff's husband also testified about his wife needing to lie down. A family member's corroborating testimony may be discounted as being influenced by his or her affection for the claimant, see **Perkins**, 648 F.3d at 901, or by financial considerations. Although the ALJ did not explicitly address Mr. Shaw's testimony, the Eighth Circuit has found that there is no error requiring remand where, as in the instant case, the same evidence that discredits the claimant's testimony also discredits the supporting party's testimony. See **Buckner v. Astrue**, 646 F.3d 549, 559-60 (8th Cir. 2011). The Court additionally notes that Plaintiff does not raise any argument relative to her husband's testimony.

Barnhart, 354 F.3d 710, 714 (8th Cir. 2008)); accord **Buckner**, 646 F.3d at 558.

Additionally, although "ALJs must acknowledge and consider [the] *Polaski* factors before discounting a claimant's subjective complaints, . . . [the] ALJs 'need not explicitly discuss each *Polaski* factor.'" **Wildman v. Astrue**, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Goff, 421 F.3d at 791); accord **Buckner**, 646 F.3d at 559; **Lowe v. Apfel**, 226 F.3d 969, 971-72 (8th Cir. 2000).

Among the factors detracting from Plaintiff's credibility were her two Oswestry scores reflecting that she had a severe level "of self-perceived disability" and the inconsistency twice noted, once by the physical therapist and once by Dr. Spencer, between her description of her pain rating, i.e., a ten, or mood, e.g., "tired and irritable," and her behavior, e.g., interacting humorously with staff, bright affect, and joking. (See R. at 277, 290, 308, 541.) See **McCoy v. Astrue**, 648 F.3d 605, 614 (8th Cir. 2011) (finding that ALJ properly discounted claimant's "self-reported symptoms" as inconsistent with observations by treating and consulting physicians); **Gonzales v. Barnhart**, 465 F.3d 890, 892, 895 (8th Cir. 2006) (affirming ALJ's adverse credibility determination based, in part, on results of Oswestry test showing that claimant "had a 'crippled perception' of his disability"); **Jones v. Callahan**, 122 F.3d 1148, 1152 (8th Cir. 1997) (affirming ALJ's adverse credibility determination based, in part, on discrepancy noted by claimant's treating physician between his appearance in the examining room and his behavior when he did not know he was being observed).

Also relevant is the lack of any objective findings, as discussed above, to support Plaintiff's complaints. Although "'[a]n ALJ may not discount a claimant's subjective

complaints solely because the objective medical evidence does not fully support them,"
**Renstrom**, 680 F.3d at 1066 (quoting <u>Wiese</u>, 552 F.3d at 733), the absence of objective medical evidence to support a claimant's complaints is a proper consideration when assessing that claimant's credibility, **id.** at 1065. Plaintiff argues that her treatment records support her testimony; however, the cited records simply report her complaints.

Additionally, the Court notes that Plaintiff was pursuing a worker's compensation claim against Save-A-Lot when also seeking DIB. "[A] claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." **Ramirez v. Barnhart**, 292 F.3d 576, 582 n.4 (8th Cir. 2002). <u>See also</u> **Gaddis v. Chater**, 76 F.3d 893, 895-96 (8th Cir. 1996) (finding that ALJ properly discounted credibility of claimant who was financially motivated to seek disability benefits).

Plaintiff described severely-restricted daily activities. The ALJ was not obligated to accept her description given the other support in the record for his adverse credibility determination. <u>See</u> **Jones**, 619 F.3d at 974 (affirming ALJ's credibility assessment based, in part, on finding that claimant's activities were "'limited more on a self-imposed voluntary basis than as a result of any functional restrictions due to her impairments'"); **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (finding that any overstatement by the ALJ of the claimant's daily activities did not require reversal given the other, substantial support in the record for his credibility findings).

"'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008) (quoting <u>Lowe</u>, 226 F.3d

at 972).  The ALJ's credibility findings are so explained and supported.  Plaintiff's arguments challenging such are without merit.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently."  **Wildman**, 596 F.3d at 964.  Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  11th  day of June, 2013.